```
                                                         USDC SDNY
                                                         DOCUMENT
UNITED STATES DISTRICT COURT                             ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK                            DOC #: _____
-----------------------------------------------------------------X  DATE FILED: 2/19/2015
  NATHANIEL HENDERSON,                          :
                                                :
                              Plaintiff,        :
                                                :              1:13-cv-6792-GHW
                  -against-                     :
                                                :              MEMORANDUM
NATIONAL RAILROAD PASSENGER CORP.,              :           OPINION AND ORDER
                                                :
                              Defendant.        :
-----------------------------------------------------------------X
```

GREGORY H. WOODS, District Judge:

Plaintiff Nathaniel Henderson brought this action against National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, alleging that, while working for Amtrak as a signal foreman, he was struck by a train and injured as a result of Amtrak's negligence. Amtrak now moves *in limine* to preclude Henderson from offering evidence or argument at trial relevant to negligence claims purportedly precluded by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101, *et seq.*, and the regulations promulgated thereunder.[1] Guided by the Supreme Court's recent decision in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014), which addressed a parallel issue of statutory interpretation, the Court holds that the FRSA and its regulations do not preclude federal claims under the FELA. Accordingly, Amtrak's *in limine* request is denied.

**I.     Background**

Henderson commenced this action in September 2013, seeking damages under the FELA in connection with two separate accidents allegedly caused by Amtrak's negligence. Discovery in the case has since been completed and the parties have reached a settlement with respect to one of those

---

[1] Although Amtrak raises several other requests in its motion, the Court separately resolved those requests during oral argument.

accidents. A jury trial on Henderson's claims stemming from the second accident is set to begin on February 23, 2015.

According to the parties' pretrial submissions, Henderson intends to prove at trial that, on May 18, 2012, in the course of his duties as a signal foreman for Amtrak, he was struck by a train due to Amtrak's negligence in failing to (1) provide him with a reasonably safe place to work, (2) warn him of an approaching train; (3) provide him with adequate manpower; (4) properly safeguard the work site; (5) properly train its employees in on-track protection; (6) take adjacent tracks out of service; (7) comply with federal rail safety regulations pertaining to Roadway Worker Protection; (8) properly train watchmen at the worksite; (9) warn him of an unsafe condition; and (10) implement reasonable procedures and protocols. *See* Doc. 55 (Proposed Joint Pretrial Order) at 2. Henderson intends to prove these claims by offering, *inter alia*, expert testimony addressing whether Amtrak complied with industry standards of care, with its own internal safety rules, and with the rules of the Northeast Operating Rules Advisory Committee. *See* Doc. 52, App'x A (Expert Report).

In its motion *in limine* and related trial memorandum, Amtrak argues that the FRSA precludes Henderson from establishing his FELA claims based on conduct that does not violate either a regulation promulgated pursuant to the FRSA or an internal Amtrak rule or standard mandated by such a regulation. Amtrak asserts that there are no such internal rules or standards in this case and that the only pertinent regulations are those contained in Subpart C, Part 214, of the Code of Federal Regulations, which are designed to protect roadway workers from being struck by passing trains. Amtrak specifically focuses on 49 C.F.R. § 214.329, which addresses the warnings that must be given by watchmen to roadway workers with respect to approaching trains. According to Amtrak, in light of the preclusive effect of the FRSA, this regulation effectively sets the standard of care in this case. Amtrak thus contends that Henderson should be precluded from offering any evidence that is not probative of whether it complied with this regulation, including evidence

2

suggesting that Amtrak violated other rules or standards of care or otherwise acted unreasonably in a manner that does not establish a violation of the regulation.

In opposing Amtrak's motion, Henderson argues, *inter alia*, that, while the FRSA preempts state law claims covered by its regulations, it does not preclude federal claims under the FELA.[2]

## II.     Analysis

### A.     The FELA and the FRSA

Enacted in 1908, the FELA provides railroad employees with a federal cause of action for injuries "resulting in whole or in part from the negligence" of the railroad.  45 U.S.C. § 51. "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers."  *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994) (internal quotation marks omitted).  Through the FELA, Congress sought to "d[o] away with several common-law tort defenses that had effectively barred recovery by injured workers."  *Id.* Courts are required to "liberally construe[ ] FELA to further Congress' remedial goal."  *Id.* at 543; *accord Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958) ("[I]t is clear that the general congressional intent [behind the FELA] was to provide liberal recovery for injured workers, and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers." (citation omitted)).  Courts have held, for instance, that the FELA creates "a relaxed standard for negligence as well as causation."  *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999) (internal quotation marks omitted).  The question of what constitutes negligence under the FELA is a federal

---

[2] Because the Court agrees with this argument, it declines to address Henderson's remaining arguments in opposition to Amtrak's motion.

question governed by the provisions of the statute and federal common law.  *See Gottshall*, 512 U.S. at 543.

The FRSA was enacted in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970."  49 U.S.C. § 20103(a).  The Secretary of Transportation has delegated this authority to the Federal Railroad Administration ("FRA").  *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 858 n. 8 (9th Cir. 2003).  The FRSA does not create a private right of action; enforcement powers under the statute are vested solely with the Secretary of Transportation and, under certain conditions, the States or the Attorney General.  *Walsh v. CSX Transp., Inc.*, No. 1:07-CV-978 (GLS/DRH), 2009 WL 425817, at *2 (N.D.N.Y. Feb. 18, 2009).

In a section addressing the preemption of certain state laws, the FRSA provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable."  49 U.S.C. § 20106(a)(1).  To maintain such uniformity, the FRSA contains an express preemption clause, pursuant to which "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."  49 U.S.C. § 20106(a)(2).  The FRSA preempts covered state law tort claims, in addition to covered state statutes and regulations.  *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 670-71 (1993).  An FRSA regulation covers and thus preempts a state law tort claim if it "substantially subsume[s] the subject matter" of that claim.  *Id.* at 664.  The FRSA, however, does not preempt state law claims alleging that a party "has failed to comply with the Federal standard of care established by a regulation or order issued by the [FRA]"

or "has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by" the FRA.  49 U.S.C. § 20106(b)(1).

The FRA regulations at issue in this case are set forth in Part 214, Subpart C, of the Code of Federal Regulations, which is entitled "Roadway Worker Protection."  The purpose of this Subpart "is to prevent accidents and casualties caused by moving railroad cars, locomotives or roadway maintenance machines striking roadway workers or roadway maintenance machines."  49 C.F.R. § 214.301(a).  In furtherance of this purpose, Subpart C "prescribes minimum safety standards for roadway workers," while expressly permitting "[e]ach railroad and railroad contractor [to] prescribe additional or more stringent operating rules, safety rules, and other special instructions that are consistent with this subpart."  49 C.F.R. § 214.301(b).

The most directly applicable provision within Subpart C of Part 214, entitled "Train approach warning provided by watchmen/lookouts," states as follows:

> Roadway workers in a roadway work group who foul any track outside of working limits shall be given warning of approaching trains by one or more watchmen/lookouts in accordance with the following provisions:
>
> (a) Train approach warning shall be given in sufficient time to enable each roadway worker to move to and occupy a previously arranged place of safety not less than 15 seconds before a train moving at the maximum speed authorized on that track can pass the location of the roadway worker.
>
> (b) Watchmen/lookouts assigned to provide train approach warning shall devote full attention to detecting the approach of trains and communicating a warning thereof, and shall not be assigned any other duties while functioning as watchmen/lookouts.
>
> (c) The means used by a watchman/lookout to communicate a train approach warning shall be distinctive and shall clearly signify to all recipients of the warning that a train or other on-track equipment is approaching.
>
> (d) Every roadway worker who depends upon train approach warning for on-track safety shall maintain a position that will enable him or her to receive a train approach warning communicated by a watchman/lookout at any time while on-track safety is provided by train approach warning.
>
> (e) Watchmen/lookouts shall communicate train approach warnings by a means that does not require a warned employee to be looking in any particular direction at the

> time of the warning, and that can be detected by the warned employee regardless of noise or distraction of work.
>
> (f) Every roadway worker who is assigned the duties of a watchman/lookout shall first be trained, qualified and designated in writing by the employer to do so in accordance with the provisions of § 214.349.
>
> (g) Every watchman/lookout shall be provided by the employer with the equipment necessary for compliance with the on-track safety duties which the watchman/lookout will perform.

49 C.F.R. § 214.329.

As indicated, Amtrak essentially argues that, in light of the preclusive effect of the FRSA on Henderson's FELA claims, the above regulation provides the exclusive standard of care by which to evaluate its alleged negligence. Amtrak thus asserts that Henderson cannot, for instance, attempt to demonstrate that it was negligent in failing to take adjacent tracks out of service while he was working, as this issue is not addressed by the above roadway worker protection regulations.

### B. Federal Preclusion

As Amtrak readily acknowledges, the FRSA expressly preempts covered state laws only, and nothing in the statute directly addresses its effect, if any, on federal claims under the FELA. Indeed, "the preemption doctrine flows from the Constitution's Supremacy Clause," and thus "is inapplicable to a potential conflict between two federal statutes." *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 86 (2d Cir. 2006). Furthermore, while the Supreme Court has recognized the existence of the related concept of preclusion of federal statutes, *see POM Wonderful*, 134 S. Ct. at 2236, it has never addressed whether the FRSA can preclude FELA claims, and the issue appears to be one of first impression in this Circuit.[3]

---

[3] Although the Eastern District of New York held in *Tufariello v. Long Island R.R. Co.*, that the FRSA precludes covered FELA claims, *see* 364 F.Supp.2d 252, 257 (E.D.N.Y. 2005), the Second Circuit vacated the district court's judgment and remanded the case for further proceedings, *see Tufariello*, 458 F.3d at 92. In doing so, the Second Circuit avoided deciding the issue of whether the FRSA precludes covered FELA claims. *See id.* at 86.

In arguing that the FRSA precludes covered FELA claims, Amtrak principally relies on the decisions of the three Courts of Appeals that have reached such a conclusion. *See Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426, 430 (6th Cir. 2009); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir. 2001); *Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir. 2000). Two of these cases, *Waymire* and *Lane*, addressed whether an FRSA regulation establishing maximum train speeds precluded a FELA plaintiff's negligence claim premised on excessive speed. In holding that the plaintiff's claims were precluded, both courts relied on the Supreme Court's decision in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993), which addressed the preemptive effect of the same FRSA regulation on claims brought under state law, and on the FRSA's stated objective of creating nationally uniform railroad safety laws. *See Waymire*, 218 F.3d at 775-76; *Lane*, 241 F.3d at 443-44. Drawing on the analysis in *Waymire*, the Fifth Circuit in *Lane* reasoned as follows:

> In the light of Congress' intent that railroad safety regulations be nationally uniform to the extent practicable, we find *Waymire* . . . persuasive . . . . Such uniformity can be achieved only if the regulations covering train speed are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim. Otherwise, a railroad employee could assert a FELA excessive-speed claim, but a non-employee motorist involved in the same collision would be precluded from doing so. Dissimilar treatment of the claims would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct.

*Lane*, 241 F.3d at 443 (quotation marks omitted). In *Nickels*, relying heavily on *Waymire* and *Lane*, the Sixth Circuit reached the same conclusion for similar reasons with respect to the preclusion of FELA claims by an FRSA regulation governing the function of track ballast. *See* 560 F.3d at 430.

While many if not most lower courts have sided with the decisions above, case law on this issue is far from uniform. *See generally Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 891-92 (8th Cir. 2012) (collecting cases both for and against the proposition that the FRSA precludes covered FELA claims). And while no other Court of Appeals has resolved this question, the Eighth Circuit has

7

expressed doubts as to whether the FRSA can preclude federal claims under the FELA. Specifically, in *Cowden v. BNSF Ry. Co.*, the Eighth Circuit noted that the FRSA was enacted in part "to address the patchwork effect of *each state* applying its own set of regulations," and that it was "not clear how negligence claims brought under the federal common law threaten the uniformity sought by the FRSA." *Id.* at 891 (emphasis added) (citing *Urie v. Thompson*, 337 U.S. 163, 174 (1949) ("What constitutes negligence for [the FELA's] purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes."); *Infermo v. New Jersey Transit Rail Operations, Inc.*, No. 10-2498 (SRC), 2012 WL 209359, at *6 (D. N.J. Jan. 24, 2012) ("[T]he language of FRSA itself gives no indication that the express preemption clause crafted to address potentially varying and disparate state laws concerning standards for the operation and maintenance of the national rail system should, by implication, extend to subsume matters governed by FELA, which is concerned primarily with providing injured railroad employees a deliberately attainable remedy.")). Ultimately, however, the Eighth Circuit declined to resolve this issue and thereby create a circuit split, both because it had not been properly raised below and because the Court was not required to resolve it. *Cowden*, 690 F.3d at 892.

This Court respectfully disagrees with the decisions in *Waymire*, *Lane*, and *Nickels*, all of which predate the Supreme Court's decision in *POM Wonderful*, which is discussed further below. The Court concludes that it must not rewrite the express statutory language of the FRSA by inferring that its regulations preclude covered federal claims under the FELA, in addition to covered state law claims. "[C]ourts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). In enacting the FRSA, Congress did not clearly express an intent to

preclude FELA claims.[4]  To the contrary, the purpose of the FRSA—"to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents," 49 U.S.C. § 20101—is entirely consistent with FELA's goal of promoting the safety of railroad employees by facilitating their ability to recover for injuries caused by a railroad's negligence.

A different conclusion is not warranted by the FRSA's vague directive that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1).  This provision must be read in the context in which it appears: a section of the statute exclusively addressing the preemption of state law. *See, e.g., Gottlieb v. Carnival Corp.*, 436 F.3d 335, 338 (2d Cir. 2006) ("[W]hen determining the meaning of a statutory provision, the text should be placed in the context of the entire statutory structure." (internal quotation marks omitted)).  Moreover, the FELA imposes a nationally uniform standard for determining whether a railroad should be held liable for injuries sustained by its employees.  As the Supreme Court noted in *Urie v. Thompson*, "[w]hat constitutes negligence for [the FELA's] purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes." 337 U.S. at 174.

It is true that, if the FRSA is read in accordance with the plain meaning of its text to preempt covered state laws only, "[t]he railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA

---

[4] In fact, the plain text of the FELA itself at least arguably prohibits the preclusion of FELA claims by FRSA regulations.  Under Section 55 of the FELA, "[a]ny contract, rule, *regulation*, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void . . . ." 45 U.S.C. § 55 (emphasis added).  The Supreme Court has held that "[t]he 'purpose or intent' of the contracts and regulations, within the meaning of [this] section, is to be found in their necessary operation and effect in defeating the liability which the statute was designed to enforce." *Philadelphia, Baltimore, & Washington R.R. Co. v. Schubert*, 224 U.S. 603, 613 (1912).  Amtrak effectively argues in this case that the FRSA roadway worker protection regulations render it exempt from the various aspects of Henderson's FELA claims that do not allege a violation of those regulations.  Accepting this argument would place the regulations in violation of Section 55 of the FELA and thereby render them void.  The Court recognizes, however, that there is a potentially viable counterargument to this assessment of Section 55 of the FELA, in that it may be the FRSA itself, rather than its regulations, that purportedly precludes FELA claims.

with respect to other classes of plaintiffs for the very same conduct."[5] *Lane*, 241 F.3d at 443. But holding railroads to a standard of care with respect to their employees that is higher than the state law standards applicable to the general public is precisely the purpose of the FELA. *See, e.g., Brotherhood of R.R. Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1, 3 (1964) (noting that the FELA was enacted "to provide for recovery of damages for injured railroad workers and their families by doing away with harsh and technical common-law rules which sometimes made recovery difficult or even impossible"). There is no clear indication that Congress intended the FRSA's regulations to trump this heightened duty, especially given that the principal purpose of the FRSA is to promote railroad safety, not to achieve nationally uniform railroad safety laws, and that the FELA imposes a nationally uniform negligence standard in any event. *Cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 56, 70 (2002) (holding that the Federal Boat Safety Act's express "policy of encouraging uniformity of boating laws insofar as practicable" did not "justify the displacement of state common-law remedies that compensate accident victims and their families and that serve the Act's more prominent objective, emphasized by its title, of promoting boating safety"); *Gottshall*, 512 U.S. at 543 ("We have liberally construed FELA to further Congress' remedial goal.").

The Court respectfully disagrees with the Fifth Circuit's conclusion that imposing FELA's heightened standard of care in cases such as this one would render the FRSA's regulations "virtually meaningless." *Lane*, 241 F.3d at 443. The FRSA's regulations are simply to be treated like any other regulation in that complying with them may provide non-dispositive evidence of due care, *see, e.g., Tufariello*, 458 F.3d at 91 ("'Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional

---

[5] To be sure, Amtrak does not explain how there could be a class of plaintiffs other than railroad employees in connection with the regulations at issue in this case, which are designed to prevent trains from striking railroad employees. *See* 49 C.F.R. § 214.301(a). The Court will nonetheless allow that the existence of such non-employee plaintiffs is at least possible in theory. For instance, members of the public could be injured as a result of a train colliding with a maintenance machine on which an employee was working.

10

precautions.'" (quoting Restatement 2d of Torts § 288C (1965)), while violating them requires a finding of negligence *per se*, *see Morant v. Long Island R.R.*, 66 F.3d 518, 523 (2d Cir. 1995) ("It is well-settled that the FELA requires a finding of negligence per se when there has been a violation of a safety statute specifically aimed at the railroad industry." (internal quotation marks omitted)). Indeed, whereas the FRSA regulations at issue in this case are intended to "prescribe[ ] minimum safety standards for roadway workers," 49 C.F.R. § 214.301(b), railroads are held to a more than merely minimal standard of care under the FELA, *see, e.g., Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438-39 (1958) ("[T]he theory of the FELA is that where the employer's conduct falls short of the high standard required of him by this Act, and his fault, in whole or in part, causes injury, liability ensues."). If Congress had intended that the FRSA both preclude covered FELA claims and preempt covered state law claims, it would have said so. *Cf. Crane v. Cedar Rapids & Iowa City Ry. Co.*, 395 U.S. 164, 167 (1969) ("We recognize the injustice of denying recovery to a nonemployee which [under the FELA] would not be denied to an employee performing the same task in the same manner as did petitioner. But it is for Congress to amend the statute to prevent such injustice. It is not permitted the Court to rewrite the statute.").

Supreme Court precedent strongly supports the conclusion that the FRSA should not be read to preclude covered FELA claims. In *Urie v. Thompson*, the Supreme Court considered a FELA claim premised on negligence arising from conduct of a railroad that allegedly violated the Boiler Inspection Act ("BIA"), 45 U.S.C. § 23 *et seq*., and that allegedly caused the plaintiff to contract an occupational disease. *See* 337 U.S. 163, 167 (1949). After a jury found in favor of the plaintiff, the Missouri Supreme Court reversed the jury's verdict, holding that the BIA was "aimed at promoting safety from accidental injury, as distinguished from injury due to the gradual inhalation of harmful dusts." *Id.* at 168 (internal quotation marks omitted). The Supreme Court reversed, commencing its discussion by emphasizing the comprehensiveness of the FELA's text:

> The language [of the text] is as broad as could be framed . . . . On its face, every injury suffered by any employee while employed by reason of the carrier's negligence was made compensable. The wording was not restrictive as to the employees covered; the cause of injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting. . . . To read into this all-inclusive wording a restriction as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court.

*Id.* at 181-82.

The Court proceeded to hold that the BIA, together with the Safety Appliance Act ("SAA"), 45 U.S.C. § 1 *et seq.*, "supplement[ ]" the FELA, "having the purpose and effect of facilitating employee recovery, not of restricting such recovery or making it impossible." *Id.* at 189. The BIA and SAA pose no obstacle to FELA recovery, the Court reasoned, since, "[i]n the absence of any specific showing that Congress had in mind such a restrictive and inconsistent object, [the Court is] not free to create one by inference." *Id.* at 190; *see also id.* at 186 (indicating that FELA's broad scope should not be "cut[ ] down . . . by inference or implication"), 182 n.20 ("The [FELA] is not to be narrowed by refined reasoning. It is to be construed liberally to fulfill the purposes for which it was enacted." (internal quotation marks omitted)). The Court emphasized that it would be "highly incongruous" to construe a statute "expediting employee recovery" under the FELA as "contracting the scope of compensable injuries and to that extent defeating recovery altogether." *Id.* at 190.

Nearly four decades later, the Supreme Court again considered the interaction between the FELA and another federal law in *Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557 (1987). The plaintiff in *Buell* brought a FELA action alleging that his fellow employees had harassed him to the extent that he was denied a safe place to work. *Id.* at 559. The district court held that the plaintiff's FELA claims were precluded by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, which "provides a comprehensive framework for the resolution of labor disputes in the railroad industry." *Id.* at 560-62. The Supreme Court disagreed, holding that the RLA had no preclusive

effect. *Id.* at 564. The Court noted that the RLA "does not mention the FELA or otherwise deal with the subject of tort liability," *id.* at 562, and again invoked core purposes of the FELA: "The FELA not only provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective-bargaining agreement, but also affords injured workers a remedy suited to their needs, unlike the limited relief that seems to be available through the [RLA]." *Id.* at 565. The Court emphasized that, "absent an intolerable conflict between the two statutes," it was "unwilling to read the RLA as repealing any part of the FELA. *Id.* at 566-67.

Finally, were there any lingering doubts as to how the Supreme Court would resolve this issue, those doubts are eliminated by the Supreme Court's recent decision in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014). There, POM Wonderful LLC ("POM") sued the Coca-Cola Company under the false-advertising provision of the Lanham Act, 15 U.S.C. § 1125(a), alleging that Coca-Cola had deceptively used the term "pomegranate blueberry" on the label of one of its products. 134 S. Ct. at 2235. In granting partial summary judgment in favor of Coca-Cola, the district court held that POM's Lanham Act claim was precluded by regulations promulgated pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq. Id.* at 2235-36. The FDCA prohibits the misbranding of food and drink and authorizes the Food and Drug Administration ("FDA") to promulgate regulations regarding food and drink labeling, including the labeling of mixes of different types of juice into one juice blend. *Id.* at 2234 (citing 21 U.S.C. §§ 321, 331). The FDCA contains a provision preempting certain state laws on misbranding. *Id.* at 2235 (citing 21 U.S.C. § 343-1(a)). The Ninth Circuit affirmed the district court's decision that POM's Lanham Act claims were precluded by the FDCA. *Id.* at 2236.

In a unanimous decision, the Supreme Court reversed. Characterizing the case as one involving statutory interpretation, the Court noted that neither the Lanham Act nor the FDCA

13

expressly precluded Lanham Act claims challenging labels regulated by the FDCA. *Id.* at 2237. In addressing the FDCA's state law preemption provision, the Court stated as follows:

> [T]he provision does not refer to requirements imposed by other sources of law, such as federal statutes. For purposes of deciding whether the FDCA displaces a regulatory or liability scheme in another statute, it makes a substantial difference whether that other statute is state or federal. By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources. Pre-emption of some state requirements does not suggest an intent to preclude federal claims.

*Id.* at 2238 (citation omitted). Furthermore, according to the Court "[t]he structures of the FDCA and the Lanham Act reinforce the conclusion drawn from the text." *Id.* The Court explained that "[t]he Lanham Act and the FDCA complement each other in major respects, for each has its own scope and purpose," and that, "[w]hen two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *Id.*

In support of upholding the Ninth Circuit's decision, Coca-Cola argued that "the FDCA precludes POM's Lanham Act claim because Congress intended national uniformity in food and beverage labeling," and that "allowing Lanham Act claims to proceed would undermine the pre-emption provision's goal of ensuring that food and beverage manufacturers can market nationally without the burden of complying with a patchwork of requirements."[6] *Id.* at 2239. The Supreme Court forcefully rejected Coca-Cola's argument, stating that "[a] significant flaw in this argument is that the pre-emption provision by its plain terms applies only to certain state-law requirements, not to federal law," and that "Coca-Cola in effect asks the Court to ignore the words 'State or political subdivision of a State' in the statute." *Id.* at 2239. In a passage that is particularly relevant to this case, the Court continued:

---

[6] Notably, Coca-Cola explicitly relied on the decisions in *Waymire*, *Lane*, and *Nickels* in support of this argument. *See* 2014 WL 1260421 (Coca-Cola's brief).

14

> Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition.  It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's pre-emption provision.  Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important.  The Lanham Act itself is an example of this design: Despite Coca-Cola's protestations, the Act is uniform in extending its protection against unfair competition to the whole class it describes.  It is variable only to the extent that those rights are enforced on a case-by-case basis.  The variability about which Coca-Cola complains is no different than the variability that any industry covered by the Lanham Act faces.  And, as noted, Lanham Act actions are a means to implement a uniform policy to prohibit unfair competition in all covered markets.

*Id.* at 2239-40 (citations omitted).

Similarly, the Court rejected the Government's argument as *amicus curiae* that Lanham Act claims were precluded "to the extent the FDCA or FDA regulations specifically require or authorize the challenged aspects of [the] label," *id.* at 2240, reasoning as follows:

> The Government asks the Court to preclude private parties from availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source.  Even if agency regulations with the force of law that purport to bar other legal remedies may do so, it is a bridge too far to accept an agency's after-the-fact statement to justify that result here.  An agency may not reorder federal statutory rights without congressional authorization.

*Id.* at 2241 (citations omitted).

Although Henderson has not cited *POM Wonderful* and the case involved two different statutes, the Court finds its reasoning highly instructive in interpreting the relationship between the FELA and the FRSA.  Like the FDCA, the FRSA authorizes an agency to promulgate specific regulations in furtherance of the statute's purpose and provides that those regulations preempt certain state laws in the interest of national uniformity.  Like the Lanham Act, the FELA provides a broad private right of action under federal law that purportedly undermines such uniformity.  And like the relationship between the Lanham Act and the FDCA, the FELA and the FRSA complement

15

each other in significant respects, in that each statute is designed to accomplish the same goal of enhancing railroad safety through different means. Under these circumstances, *POM Wonderful* clearly dictates that the FRSA should not be interpreted to preclude federal claims under the FELA, in accordance with the plain meaning of its text. Admittedly, whereas the objective of achieving nationally uniform laws in a particular area is explicitly stated in the FRSA's state law preemption provisions, that objective is merely implicit in the similar provisions of the FDCA. But it is clear from the reasoning in *POM Wonderful* that this relatively minor distinction does not warrant reaching a different result. Nothing in the Supreme Court's decision suggests that its reasoning hinged on Congress's failure to make explicit the FDCA's implicit objective of achieving nationally uniform laws related to food and drink labeling.

In sum, in accordance with the Supreme Court's instructions that the FELA's broad scope should not limited by inference, *see Urie*, 337 U.S. at 186, 190, and that "[p]re-emption of some state requirements does not suggest an intent to preclude federal claims," *POM Wonderful*, 134 S. Ct. at 2238-39, the Court holds that the FRSA and its regulations do not preclude any aspect of Henderson's FELA claims. "Although the application of a federal statute . . . by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy"—in this case, to provide liberal recovery for injured railroad workers. *Id.* at 2239. "It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by [a statutory] pre-emption provision." *Id.* at 2239-40. This analysis holds true here too with respect to the FRSA's preemption provision, which is expressly limited to the preemption of state law. "Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important." *Id.* at 2240.

16

### III. Conclusion

For the foregoing reasons, Amtrak's request that the Court preclude Henderson from offering evidence or argument at trial relevant to conduct that does not establish a violation of an FRSA regulation is denied.

SO ORDERED.

Dated: February 19, 2015
New York, New York

_____
GREGORY H. WOODS
United States District Judge